ANDERSON CARRIAGE CO. *v.* PUNGS.

1. PLEADING—DECLARATION—REQUESTS TO CHARGE.

A declaration alleging that defendant represented to plaintiff that its business of manufacturing brake-beams would not cease because the American Brake-Beam Company, which had theretofore purchased all its product, discontinued its purchases, as he was procuring patents for improvements in brake-beams, which he would assign to plaintiff, and that plaintiff would make large profits in manufacturing them, greatly in excess of any profits theretofore realized from its contract with the American Brake-Beam Company, sufficiently stated the theory upon which plaintiff sought to recover to justify the refusal of a request that plaintiff was not entitled to recover on the theory that defendant promised to make good to plaintiff any loss it sustained by reason of the failure of the American Brake-Beam Company to renew its contract.

2. CORPORATIONS—CONTRACTS—OFFICERS.

Defendant brought about a consolidation of a corporation, in which he owned an interest, with another company, through representations that its business was very profitable; but, after the consolidation, the business ceased to be profitable, and the officers of the consolidated company were about to wind up its affairs. Defendant then promised to assign to the latter company patents which would make the business profitable, if the officers would retain their connection with the company and continue the business. *Held*, that the court could not say, as a legal conclusion, that it was a personal contract between individuals.

3. SAME—MEASURE OF DAMAGES—INSTRUCTIONS.

In such case an instruction to the jury that, if they found for plaintiff, they should award such damages as would compensate it for the loss of the patents which defendant agreed to

transfer to it, was not reversible error, where defendant did not request a more detailed instruction on the subject of damages.

4. EVIDENCE—OPINION OF COURT—DISCREDITING WITNESSES.
An opinion of the Supreme Court in another case between the same parties is not admissible for the purpose of discrediting the testimony of one of the parties.

Error to Wayne; Rohnert, J.   Submitted June 3, 1903. (Docket No. 23.)   Decided September 30, 1903.

*Assumpsit* by the Anderson Carriage Company against William A. Pungs for the breach of a contract to convey certain patents.   From a judgment for plaintiff, defendant brings error.   Reversed.

*Barbour, Rexford & Field,* for appellant.

*Russel & Campbell,* for appellee.

MOORE, J.   This is a suit in *assumpsit,* brought by the Anderson Carriage Company, a Michigan corporation, against William A. Pungs.   The plaintiff recovered a verdict for $17,970.24.   The defendant has brought the case here by writ of error.

Prior to February 12, 1897, the Anderson Manufacturing Company was a corporation located in the city of Detroit. The Michigan Railway Supply Company was also a corporation located in the city of Detroit.   On February 12, 1897, the two companies were consolidated, and all of their property and assets were conveyed to a new company, known as the Pungs-Anderson Manufacturing Company.   On the 29th day of May, 1899, the name of the consolidated company was changed to the Anderson Carriage Company, the plaintiff herein.

It is the claim of the plaintiff that the negotiations which brought about the consolidation of these companies were conducted by Anderson and Locke, representing the Anderson Manufacturing Company, and Pungs, representing the Michigan Railway Supply Company; that in

these negotiations Pungs represented that the earning capacity of his company, the Michigan Railway Supply Company, was equal to 10 per cent. of its capital stock, which he represented to be $400,000; that there were two departments to the plant of the Michigan Railway Supply Company, viz., the department in which nuts and washers were manufactured, and the department in which brake-beams were manufactured; that the brake-beam department constituted much the larger portion of its business, and yielded 70 per cent. or 75 per cent. of its annual earnings; that the brake-beam department was so related to the nut and washer department that it was impracticable to continue the running of the latter in case the company was compelled to close the former department, for the reason that the nuts and washers so manufactured were made from the iron scrap of the brake-beam department; that the brake-beams were made solely for the American Brake-Beam Company of Chicago, and this constituted the entire business of the brake-beam department. In December, 1897, the American Brake-Beam Company canceled its contract with the Pungs-Anderson Manufacturing Company. It is claimed the Michigan Railway Supply Company was taken into the consolidation upon the representation that it could be relied upon to yield more than 50 per cent. of the earnings of the consolidated company, and its stockholders received in exchange for their holdings stock of the consolidated company to the amount of $100,000, while the stockholders of the Anderson Manufacturing Company received consolidated company's stock to the amount of $70,000 only.

It is claimed that in January, 1898, Anderson and Locke, in their own behalf and as officers of the Pungs-Anderson Manufacturing Company, informed Pungs they intended forthwith to sever their connection, both individually and as officers of said company, and intended to place their holdings upon the market, and dispose of them as best they could; and, as officers of the company, they notified Pungs that the Pungs-Anderson Manufacturing

Company was crippled to such an extent by the loss of the brake-beam business that, as such officers, they would immediately urge a disposition of the assets of said company in whatever way might seem practicable, and, as officers of said company, would do all in their power towards winding up the affairs of said Pungs-Anderson Manufacturing Company; that Pungs admitted the seriousness of the situation, and his responsibility for it, and endeavored to induce Anderson and Locke to refrain from taking the steps which they had determined upon, and said that the department for manufacturing brake-beams would not have to be closed and cease operating because of the American Brake-Beam Company's discontinuing doing any further business with them, and that, on the contrary, he (Pungs) was procuring and was about to procure letters patent upon improvements in brake-beams, which patents he represented to be of great value, and that the Pungs-Anderson Manufacturing Company, by using these patents, could continue to manufacture brake-beams, and make large profits out of its brake-beam department; and Pungs promised to turn over and assign to the Pungs-Anderson Manufacturing Company these patents to make good the loss which it had suffered from the failure of the brake-beam business.

It is claimed Anderson and Locke promised and agreed to continue their connection with the company and to retain their holdings of stock in the same, and, as officers representing said company, promised and agreed with Pungs to withhold urging a disposition of the company's assets, and, as said officers, promised and agreed to refrain from doing anything towards winding up the affairs of said company, or taking any steps towards changing the policy of the company in any manner whatsoever on account of the crisis which the company then was facing; that Pungs, in consideration of the promises of Anderson and Locke, promised and agreed to and with them, as officers of the corporation, to transfer and assign to the Pungs-Anderson Manufacturing Company, for its own

use and benefit, such valuable patents for improvements upon brake-beams as would enable the company to carry on its brake-beam business at a large profit; that, in pursuance of this agreement, the company, with the knowledge of Pungs, and under his direction, and at his request, made expenditures of at least $400 in manufacturing patterns, in purchasing tools and raw materials, and employment of labor, etc., for the purpose of putting into practical working order the said patents for improvements in brake-beams; that Mr. Pungs obtained the patents in June, 1898, and April, 1899, and that, instead of turning them over to the plaintiff, as he agreed to do, he sold them to the American Brake-Beam Company of Chicago for $10,000. In the agreement by which the American Brake-Beam Company agreed to pay Pungs $10,000, Pungs not only turned over the patents to the Brake-Beam Company, but also promised and agreed not to engage in the brake-beam business in any way, shape, or form at any place within the United States of America, its territories, or the District of Columbia, and that he would not be connected with any company manufacturing or selling brake-beams in the United States, either as officer, employé, or shareholder (Chicago Railway Equipment Company alone excepted), at any time during the period covered by said letters patent.

It is claimed that, by reason of Pungs' breach of his contract, the Anderson Carriage Company was compelled to abandon the manufacture of brake-beams, nuts, and washers, which constituted the entire business of what had been the Michigan Railway Supply Company prior to the consolidation. On the part of Pungs it was denied any such agreement was made.

It is claimed the court erred in refusing to give the following request:

"That the plaintiff is not entitled to recover in this cause on the theory that the defendant promised to make good to the plaintiff the loss, if any, which it sustained by reason of the fact that the American Brake-Beam Com-

pany did not enter into a new contract with the plaintiff after the expiration of the contract from January 1, 1897, to January 1, 1898, offered in evidence, and marked ' Exhibit G,' since the declaration does not allege any agreement on that theory, and since damages for breach of such agreement, if such agreement was made, cannot be recovered under the common counts annexed to the special count in the declaration in this cause."

The declaration contained the following:

"And thereupon the said Pungs represented to said Anderson and said Locke that the said department for manufacturing brake-beams would not be closed and cease operating because of said American Brake-Beam Company's discontinuing doing any further business with it, but, on the contrary, that he, the said William A. Pungs, was procuring and. was about to procure letters patent upon certain improvements upon brake-beams, which said patents said Pungs represented to be of great value; and said Pungs further represented that the said Pungs-Anderson Manufacturing Company, by using said patents and manufacturing brake-beams by such use, would be able to make large profits out of the brake-beam department of said company; which said patents said Pungs promised to turn over and assign to said Pungs-Anderson Manufacturing Company, to be and remain its property.
*   *   *

"Said Pungs represented that he would turn over and assign to said Pungs-Anderson Manufacturing Company said patents to be issued, to be and remain its property, and that the ownership of said patents to be issued by the said Pungs-Anderson Manufacturing Company would place it (the said company) in such a position with regard to manufacturing brake-beams that it would be beyond competition, and that because of said Pungs transferring his rights to said company in said patents to be issued, and the company having the benefit thereof, said brake-beam department would thereafter yield large and increased earnings. And said Pungs represented that he considered it extremely fortunate from a business point of view for the said Pungs-Anderson Manufacturing Company that its relations towards said American Brake-Beam Company were so altered on the initiative of the said Brake-Beam Company that it (the said Pungs-Anderson Manufacturing Company) could enter upon the manufacture of

brake-beams independently and in competition with the said American Brake-Beam Company, which theretofore it was not in a position to do; and further represented that the additional earnings thus accruing to the said Pungs-Anderson Manufacturing Company by the use of said patents to be issued would be far in excess of any profits theretofore realized from or on account of the business with said American Brake-Beam Company."

The bill of particulars also claimed for the value of the letters patent as particularly set forth in the declaration filed in this suit $60,000, and also, January 1, 1901, damages resulting from breach of contract, whereby said defendant agreed to transfer and assign valuable patents to plaintiff, by the use of which plaintiff could manufacture brake-beams at a large profit, $15,000.

We think the theory of plaintiff was sufficiently set out in the pleadings to justify the court in refusing the request.

It is claimed the plaintiff cannot maintain this action; that the contract, if any was made, was between Mr. Anderson and Mr. Locke on one side and Mr. Pungs on the other, and that the plaintiff is not a proper party to the litigation. The circuit judge charged the jury upon that feature of the case as follows:

"If you find that he did make this promise, you will consider the next question,—to whom did he make the promise? If he made the promise to assign to the plaintiff company—If you find that he made a promise to assign to Anderson and Locke personally, you will find for the defendant, because, if he made the promise to Anderson and Locke personally, and not to the plaintiff company, there is no such contract here as will entitle the plaintiff company to bring the action. So, if you find that he promised, and that the promise was made to Anderson and Locke personally, in consideration of their personal promises, you must find for the defendant, ' No cause of action.' If, however, you find that these promises were made to the plaintiff company, and were made to Mr. Anderson and Mr. Locke as officers of the company, acting for the company and on behalf of the plaintiff company, then you will find for the plaintiff."

A similar question was before the court in *Anderson Carriage Co.* v. *Pungs*, 127 Mich. 543 (86 N. W. 1040). The trial court charged the jury as follows:

"There is just one question in this case to be submitted to you, and that is whether or not Mr. Pungs, the defendant, is entitled to his salary from the 5th of May to the 1st of June, 1899. You have heard the testimony of these various witnesses produced here. On the part of Mr. Pungs, it is plain that his salary was to continue until he was released from his obligations on certain notes; that he subsequently waived this, and put in a resignation, to take effect on the 1st of June. Other witnesses produced by the plaintiff in this case testified that it was the arrangement that Mr. Pungs should vacate his position on the 5th of May, and that his salary should then cease. Now, that is peculiarly a question for you. What was the agreement? If it was the agreement between these parties that Mr. Pungs' salary should cease when that stock was transferred, then Mr. Pungs is not entitled to that salary after the 5th of May. If, on the other hand, it was the agreement that his salary should continue until he was released from his obligations on this outstanding paper, then he is entitled to his salary from the 5th of May to the 1st of June."

Mr. Justice HOOKER, speaking for the court, said:

"This defendant claims that his office was not made vacant by the sale of his stock; that there is no evidence that, as part consideration for the purchase of his stock, he agreed to vacate the office; and that, if there was such contract, it was between him upon one side, and Anderson, Locke, and Newcomb upon the other, and that the plaintiff was not a party to it.

"The jury found that Pungs did agree to get out of the company and give up his office upon the sale of his stock, and we think the evidence indicates that it was the understanding of all that he should. We think, moreover, that he is in no position to deny plaintiff's right to treat the office as vacant. It is apparent that the action of the members of the board of directors was not merely personal. The interests of the concern demanded a change, and its officers negotiated with Pungs to bring it about. We cannot say, as a legal conclusion, that this was a personal contract between the individuals."

See, also, *Monaghan* v. *Insurance Co.*, 53 Mich. 238 (18 N. W. 797).

It is claimed the court erred in his charge to the jury upon the question of damages. The charge relating to that subject was as follows:

"If you find for the plaintiff in this case, you will award the plaintiff such damages as, in your judgment, will compensate the plaintiff company for Mr. Pungs' failure to carry out his part of the contract, if you find that he made the contract.   *   *   *

"If you find for the plaintiff, you will award it, as I have said, such damages as, in your judgment, will compensate it for the loss of the patents which Mr. Pungs agreed to transfer to the company."

The judge was not requested to charge the jury more in detail upon this subject. The only request made by defendant bearing upon the question of damages was that, if the jury found in favor of the plaintiff, it should be for only nominal damages, namely, six cents. As there was testimony tending to show that the patents were sold for a large amount, this request was properly refused. We do not think, in view of this record, the failure to charge more in detail upon the subject of damages was reversible error.

Upon the trial Mr. Anderson and Mr. Pungs were witnesses. Their testimony was contradictory to each other. They were both witnesses in the case referred to later. Upon the trial of this case the following occurred:

"*Mr. Campbell:* I now offer in evidence a decree of the Supreme Court of Michigan, filed July 19, 1901, in the case of *Anderson Carriage Co.* v. *Pungs*, 128 Mich. 49 (87 N. W. 105), in which it is judicially determined what the intentions of the parties are in relation to the conveyance of this land that has been referred to.

"*Mr. Rexford:* That is absolutely absurd, immaterial, and irrelevant. Mr. Pungs admitted that the court was against him in that case, and said that it was based upon the false testimony of Mr. Anderson. The object of it is to cast some reflection upon Mr. Pungs, by reason of the fact that the court held against him where his testimony

was on one side and Mr. Anderson's was on the other. I think any such offer as that is improper, and I take an exception to it.

"*The Court:* I think, in view of the testimony, it would be material for the other side to show what property passed from the railway supply company to the consolidated company. They have a right to show what the property was which passed to the consolidated company.

"*Mr. Rexford:* We have conceded what the deed was, and to read the opinion of the Supreme Court cannot be material.

"*The Court:* It is material in view of the testimony of Mr. Pungs characterizing the testimony of Mr. Anderson in the other case. I think I will permit such parts of this opinion to be read as will show whether the Supreme Court, in passing upon the matter, passed upon the question of the veracity as between Mr. Pungs and Mr. Anderson. Mr. Pungs' testimony was that it was a question of veracity between himself and Mr. Anderson which decided the question. If there are any parts which bear upon that, I will permit it to be shown."

An exception was taken, and Mr. Campbell read to the jury from the opinion of the Supreme Court, as follows:

"Mr. Pungs was asked:

"'*Q.* You heard Mr. Newcomb's testimony. Do you recollect any conversation with him with reference to buying an acre?

"'*A.* No, sir.

"'*Q.* What conversation do you recollect that you had with him about buying an acre, or about the amount of land that was to be deeded?

"'*A.* When I had the conversation,—the only conversation that I recollect,—the records show that is what land we needed. We bought just what we needed, and no more. We needed just that piece, and no more. We had a building 300 by 75 feet, and that is five times the size of the building that they had before that. It was ample for our use in every respect.'

"On his cross-examination defendant was asked:

"'*Q.* Isn't it true, in the conversation that you had with Newcomb and the others at the time interested in the company, that your talk was that you would sell them one acre?

"'No, sir. If there had been we would never have said so many feet. * * *

" 'Q. There was no such talk about an acre at all?

" 'A. I do not think so. We might have said that it was about an acre, and gave them the dimensions.'

" He was then examined upon the statement in the deed that the property contained about one acre. He was. asked:

" ' Q. What do you mean by the statement in the deed that the parcel hereby conveyed contained about one acre of land ?

" 'A. I did not put it in. I asked Mr. Post [the attorney], and he said it was customary when it was anywhere near an acre.'

" It appears to us that the facts of this case all tend to show that the whole of lot 21 was intended to be conveyed by the deed of September 23d."

It will be seen this opinion was read for the purpose of discrediting Mr. Pungs. This court passed upon the case made by the record which was presented to it in the case then before it. Whatever may have been its opinion as to the credit to be given to Mr. Pungs in that case, it was no more competent, as bearing upon the question of what credit should attach to Mr. Pungs' testimony in this case, than would be the opinion of one of the jurors in that case. Counsel, with all their zeal and learning, have not called our attention to an authority justifying the admission of this opinion. We think they would have done so if one could have been found. We think this was harmful error, and for it the judgment of the court below is reversed, and a new trial ordered.

HOOKER, C. J., CARPENTER and GRANT, JJ., concurred. MONTGOMERY, J., did not sit.